Mr. Bruder, I see you were appointed under the Criminal Justice Act and the Court appreciates your service.  May it please the Court, my name is Glenn Bruder and I represent Romelle Smith. There were two issues raised in the course of this appeal. I intend to restrict my argument today to the question of the constitutionality of the stop of the vehicle in which Mr. Smith was a passenger. That's the topic that consumed the vast majority of the appellant's brief in this matter. What happened to Mr. Smith really isn't much in dispute. The Minneapolis Police Department believed that an individual named Jemichael Ramey shot someone on July 16, 2020. Four days later, on July 20th, the police stopped a vehicle in South Minneapolis hoping to find Mr. Ramey. They didn't. Instead, they found Romelle Smith, who was riding as a passenger in a car that wasn't Mr. Ramey. Unfortunately, the appellant was a convicted felon and he had a handgun. This led to his indictment in the United States District Court for Minnesota as a felon in possession of a handgun. And as part of his defense, the appellant contended that the vehicle stop violated the Fourth Amendment. For the purposes of this appeal, actually throughout the case, I conceded that this was an investigatory stop that's still subject, of course, to the Fourth Amendment protection and requires that the stop be supported by reasonable suspicion. In this case, reasonable suspicion means a reasonable suspicion that the suspect sought by police, Mr. Ramey, would be found in the vehicle. That doesn't mean a hunch, it doesn't mean a thought, it means something that's supported by particularized facts. Well, what exactly did the police have here in the way of particularized facts when they stopped this vehicle? They had a cell phone number that was provided by a confidential informant and not much more. On July 16th, the Minneapolis police officer overseeing this investigation, or at least overseeing the stop, Officer Schmidt contacted a C.I. whose identity remains unknown. The C.I. told Officer Schmidt that he had spoken, that is, the C.I. had spoken to Ramey on a particular cell phone number earlier in the evening of July 16th. The next phase of the search for the suspect, Mr. Ramey, involved obtaining a GPS tracking warrant from a state court judge. And after that, the next phase of the investigation, well, it involved doing nothing for several days because Officer Schmidt had some time off. When he returned to work about four days later, Officer Schmidt looked at the GPS tracking data and it seemed to link the cell phone to an apartment building in south Minneapolis. At that point, Officer Schmidt made a decision to begin surveilling that apartment building. Now, it's probably helpful to look at this point under Illinois v. Gates. The validity of an investigatory stop is going to be based on the totality of the circumstances. So what happens both up until now and after that point is going to be, it tends to be a fact-specific analysis for this court. And to be candid, it's the appellant's position that if you look at the totality of the circumstances from July 16th until his vehicle was stopped on July 20th, what shows more than anything else is, frankly, a lazy, slipshod, and unmotivated police investigation. Let's start with the surveillance of this apartment building. Even though the apartment building has multiple units and multiple exits, the Minneapolis police decided to surveil only the front entrance to the building. Anyone who was trying to hide from the police, like Mr. Ramey, could have easily exited the building, unobserved by police, from the rear entrance. Then, after surveilling the building for a period of time, the police made a decision to stop literally the first young black man they saw. And Officer Schmidt was candid at the motions hearing in saying that the reason that they stopped the vehicle in which Mr. Smith was riding was, well, frankly, because he was the first young black man that the police had seen. There seems to be a bit more than that in the record. I mean, it seems to me that what they've got is a confidential informant that they've used 30 times before, and they haven't had problems with them that have been identified anyhow. They set up surveillance, but in order to surveil the front door, they were 125 or 100 yards away. From that vantage point, they saw a person who appeared by build and general description to meet the physical characteristics of the person, and there's the phone. And the phone they have, they believe, tied to the suspect that they're looking for. And the phone leaves the building, gets in the vehicle, and drives away. And so that's the totality of the circumstances that they would point to. And you're saying that that's not a reasonable and articulable suspicion. Well, it's clearly articulable because if you just listen to it, it's been articulated. Why is it unreasonable? For a lot of reasons, Your Honor. I get that. You're going to say that. Just tell me what they are. Well, first of all, I'm going to compliment the government because when I read their brief, they did an excellent job. I had to read it twice because I thought I was wrong the first time I read it. I thought, what could I have possibly missed? It makes so much sense when I read the government's brief. Until I realized that they were focusing on the wrong thing. The government, and to some degree your question, focused on is there a reason to believe that the cell phone that the CI provided to the government, to the police, was in the vehicle? But that's not the question. The question isn't whether the cell phone was in the vehicle. The question is whether Mr. Ramey was in the vehicle. So let's start with that. First of all, the physical similarities between Mr. Ramey and Mr. Smith are negligible. Mr. Ramey is several inches taller and quite a bit heavier. Mr. Smith has a similar build, right? Even though there's a 35-pound weight difference, there's the four-inch height difference, which would, from 100 yards away, might be a little bit hard to observe. Well, you can make that argument, and I suspect it would also be hard to observe that Mr. Smith has a full face of tattoos, which also distinguishes them. Their hairstyle was different. That could have possibly been noticed. So I don't necessarily concede that there was a huge physical similarity. In fact, what Officer Smith said, the primary physical similarity he got was they were two young black men. And beyond that, the validity of that cell phone information is tied to the reliability of the informant. If the informant provided them with a garbage bit of information, but the plausibility of the information, the weight that the police could place on that information is tied to the reliability of the informant. And as the Court made clear in Gates, we don't ignore the ad valar factors any longer. Now, counsel, the problem I have with your case is you concede that you're not challenging the tracking warrant. And the confidential informant's information was the basis, probably the primary basis for issuing the tracking warrant. Now we're into the surveillance that resulted from the valid traffic warrant. I don't see the relevance of the reliability informant in the typical suppression context. He's just that the officers relied on him. They didn't have to have evidence in this suppression hearing that he provided information that was reliable enough to persuade a magistrate to issue a warrant. It's just part of the totality. The tracking warrant doesn't authorize the police to stop a vehicle. It doesn't authorize the police to stop any vehicle in which they believe that cell phone provided the data that led to, as you say, this factual what you call sloppy police work. I think, of course, if they got reasonable suspicion, it doesn't matter how sloppy they were. Well, there's a couple of ways of answering that. But you're right. We can't challenge the tracking warrant because Mr. Smith simply has no standing to do that. But the tracking warrant itself is an investigatory tool. It doesn't necessarily mean that there's the information it provides affords reasonable suspicion to stop the vehicle. For example, and I think I used this in my reply brief, if the police saw me get into that vehicle, I clearly am not Mr. Ramey. And they might have a tracking warrant that suggests I'm carrying the cell phone that they were given, but clearly I am not their suspect. And in this instance, what I would say is that there was a literal desert of information provided at the motion hearing about the reliability of this particular informant. We know they had used him on prior occasions. But when I asked the police officer had he provided bad information on prior occasions, he didn't know. Not yes, not no. I don't know. So what? I mean, you're arguing like this was a Frank's hearing. No, I'm not arguing that it's a Frank's hearing because I'm not arguing the officers acted in bad faith. The standard is much different. Well, I'm not. The standard. This is reasonable suspicion. This isn't probable cause to issue a warrant. I agree it's reasonable suspicion, but the question is. You've got physical similarities. You've got lots of phone track activity and that leads to a reasonable belief that the phone was in the car. But we don't. Why isn't that suspicion that justifies a stop of the car to see if Ramey's in it? Because we don't have any basis at all for understanding why the confidential informant, the merit of the confidential informant's claim that Ramey was connected to that cell phone. We don't know whether that cell phone belonged to Ramey or to a third party. I don't understand. I come back to saying they got the warrant. The reasonable suspicion was based upon the results of the tracking. I agree there's a reasonable suspicion that the cell phone was in the car. My position, the appellant's position, is that there was never reasonable suspicion based solely on that information to stop the vehicle. What's our standard review on that question? Standard review in this case is a mixed one. It's clearly erroneous on that question you just said. It's clearly erroneous as to the facts, as to the judge's conclusion that the stop was legitimate. That's been a de noble basis. You're arguing the facts. I'm arguing the lack of facts, Your Honor. Well, same thing. And that's the whole point. But the district court obviously thought there were facts. Well, the district court, interestingly enough, if you look at the motion here in transcript, any time we got close to a fact that would test the credibility of the confidential informant, there was an objection. And the objection was sustained by the magistrate judge. I've got a minute, which I'll save for rebuttal. Thank you. Ms. Kilpatrick. May it please the Court. The district court here found that officers acted reasonably, albeit mistakenly, when they stopped the GMC envoy that the defendant was a passenger in, believing that the shooting suspect, Ramey, was the passenger instead. The district court anchored its conclusion based on two sets of facts. Facts about the defendant's and Ramey's physical appearances, and facts about Ramey's purported location. So I want to spend my time talking about those two categories of facts. Facts about physical appearance, and facts about location. With respect to physical appearance, I want to begin by emphasizing that the district court specifically rejected the notion that officers believed the defendant was Ramey, based solely on the defendant's race. The district court rejected that, and the defendant hasn't attempted to show that that rejection was clearly erroneous. He couldn't make that showing because the facts here, the facts in the record, show that the defendant and Ramey did indeed bear similar physical resemblance to one another. Officer Schmidt and Sergeant Lipinski both testified that the data they received from the ping warrant formed a large corroborating portion of their assessment that the defendant was Ramey. But in addition to that, Officer Schmidt testified that he believed the defendant was Ramey based on their similar ages as well as his race. Sergeant Lipinski gave a more detailed description as to why he believed the defendant was Ramey. He reached that conclusion based on their similar heights, weights, and builds, based on their complexion, based on their ages, and based on their hair. The defendant, I just heard argue, and he argued in his brief that hair was a distinguishing characteristic between the defendant and Ramey. But that's not true. Both Officer Schmidt and Sergeant Lipinski made their comparison between the defendant and Ramey based on two photographs that were in the rest operational plan. Those photographs are in evidence as Government Exhibit 2, and Ramey has two different hairstyles in those pictures. And in one of those pictures, he had short hair, just like the defendant had. And I think it's also important to note that both Officer Schmidt and Sergeant Ramey based on their own observations without sharing their assessments with one another. He indicated that they had similar builds based on their height and weight from the distance from which he was observing the front of the apartment building where the defendant was seen. He indicated that it's difficult to determine with specificity a person's height and weight from a distance, but based on the information he had, they appeared to both be of similar medium build. So he didn't say, I thought the height of the man I saw matched the height that I was told about Ramey? Sergeant Lipinski didn't say they matched. He said that they were similar builds based on their heights and weights. Right. And you're talking about somebody identifying someone standing next to a doorway being the only sort of reference of height, and there's a four-inch height difference. There's 35 or 40 pounds difference in weight. And from 100 yards away, some officer opined that from 100 yards away, they looked like they had similar height and weight, which is, you know, I don't know that there's much you can attribute to that, but you can say that the general build is the same, you know? Obviously, if Judge Colleton and I were standing 100 yards away, I would have a different build than Judge Colleton, right? And that's part of it. But I wonder if it even matters, because, you know, if you have a person who's got a cell phone, been accused of kidnapping, and a person gets into a car with someone who's the same general size and shape of the victim and drives away, and the cell phone keeps pinging as being in that car, isn't that alone enough to stop the car? Isn't that reasonable? I think under those facts, yes, Your Honor, it would be reasonable. And it certainly was reasonable here based on the facts known to officers. From a distance, which is part of the totality of the circumstances, is the vantage point that the officers had, they did appear to be physically similar. And that really is the unifying thread in the mistaken identity cases that this court has affirmed as objectively reasonable conduct on the part of the officers. In Phillips, in Bobo, the defendants in those cases generally matched the physical descriptions of the suspects they were believed to be. But more importantly than that, they didn't possess any disqualifying physical characteristics that would distinguish them, that would distinguish the defendants from the suspects. And those distinguishing characteristics, the disqualifying characteristics are the examples the defendant has raised in his reply brief and here today at argument. If that car had only been occupied by white men or a woman and her small children, which are the examples in his reply brief, then officers wouldn't reasonably conclude that Ramey was in the car with the phone. But those aren't the circumstances that officers face. They were faced with a person who bared similar physical characteristics, resemblance, with the suspect Ramey. And that's what the district court found. The district court found specifically that the defendant's appearance was physically consistent with Ramey's. And that's a factual finding and one that's supported by the record. The district court made that conclusion after hearing all the officers' testimony. And there were actually three officers who testified that they believed the defendant, his physical appearance was consistent with Ramey's. The district court also saw the defendant right there in the courtroom during the motions hearing. The district court also saw the body-worn camera of the arrest that showed the day he was arrested. And the district court had the pictures of Ramey in evidence as well. And based on all that evidence, the district court made the factual determination that their appearances were physically consistent. So that's the first category of facts, physical appearance. Did the government argue that there was, given the, particularly given the phone pinging and the history of that, there was reasonable suspicion to stop the car because even if Ramey was not in the car, the phone in the car suggested that there might be evidence leading to the location, to finding Ramey? We did not make that argument, Your Honor. I think in part, the facts here are so clear. The officers believed that Ramey was in that car when they stopped it. And they believed he was in that car. Again, the first category facts are his physical appearance. But the second category facts are just that, the location data. The warrant in this case didn't just say, officers, you can have this data. The warrant said there is probable cause to believe that the person who possesses this phone committed a crime. So when they watched that phone move from the apartment building where a person matched the defendant's description, get in a GMC envoy, and then watch as that phone traveled with the envoy, they were acting on facts, facts supplied by the data from the ping warrant and facts supplied by their own observations of the defendant's physical resemblance to Ramey. And when officers are acting on facts and not acting on hunches, they're acting reasonably. There was reasonable suspicion for officers to stop that GMC envoy because they reasonably believed that the defendant was Ramey. If Your Honors don't have any further questions, I will cede my time and ask that this Court affirm the District Court's judgment in this case. Very good. Thank you. Your Honor. Thank you, Your Honor. At the motions hearing, I tried repeatedly to raise questions to test the confidential informant's credibility. My questions were objected to by the government and repeatedly sustained by the magistrate judge. How can the credibility of a confidential informant be effectively challenged if it can't be questioned? Did you challenge those rulings to the District Court? I did, Your Honor. I raised objections to the report and recommendation. The District Court judge expressed, in fairness, grave reservations about the credibility of the confidential informant and about the thwarted cross-examination, but nonetheless upheld the magistrate judge's decision. However, there was one question and one answer that was telling at the motion hearing. Question. Other than the fact that Mr. Smith happened to be a young black man, was there anything about him that made you believe that he had committed a crime? Answer. No. I'd suggest that we believe Mr. Smith. Thank you. Thank you, counsel. The case has been well briefed and argued. We'll take it under advisement.